IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**KATHLEEN M. HEPBURN,**

    **Plaintiff,**

                              **Civil Action 2:17-cv-124**

**vs.**

                              **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

    **Defendant.**

## OPINION AND ORDER

Plaintiff, Kathleen M. Hepburn, brings this action under 42 U.S.C. §§ 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. This matter is before the Court for disposition based upon the parties' full consent (ECF No. 11) and for consideration of Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 19), and the administrative record (ECF No. 10). Plaintiff did not file a Reply. For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

                              **I.    BACKGROUND**

Plaintiff applied for disability insurance benefits on June 20, 2013, alleging disability beginning January 28, 2004. (R. at 197–203.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 101–08.) Plaintiff sought a *de novo* hearing before an administrative law judge. (R. at 11.) Administrative Law Judge Jason Earnhart ("ALJ") held a hearing on October

5, 2015, at which Plaintiff, represented by counsel, appeared and testified. (R. at 37–78.) On November 27, 2015, ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. at 15–29.) On December 9, 2016, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1–7.) Plaintiff then timely commenced the instant action.[1]

## II. HEARING TESTIMONY[2]

### A. Plaintiff's Testimony

Plaintiff testified that she was 58 years old at the time of the hearing. (R. at 41.) She lives with her brother. (R. at 42–43.) She has a driver's license and drives a car, but she does not drive so much anymore and was given a ride to the administrative hearing. (R. at 43, 56.) Her sister or brother usually drove her around. (R. at 56.) She once owned and rode a Harley Davidson motorcycle and had an accident on it in 2011. (R. at 56–58.) The motorcycle fell on her right leg, causing the leg to break. (R. at 58.) She sold the motorcycle in 2014. (R. at 56.)

---

[1] Plaintiff previously applied for disability insurance benefits on December 3, 2004, alleging disability beginning November 11, 2004. (R. 16, 91.) Plaintiff's previous claim was denied initially and upon reconsideration. (R. at 91.) On February 5, 2008, the administrative law judge held a hearing. (*Id*.) On April 25, 2008, the administrative law judge issued an unfavorable decision as to the prior claim. (R. at 91–98.) As to the effect of that previous decision, the ALJ in the present claim found as follows, which the parties do not dispute:

> [T]he current claim involves deciding whether the claimant is disabled during a period that was not adjudicated in the final decision on the prior claim, and, as discussed in detail in the decision below, the undersigned finds that the record contains new and additional evidence that provides a basis for a different finding of the claimant's residual functional capacity.

(R. at 16; *see also* R. at 15 (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997)).)

[2] The Court limits its analysis of the evidence and the administrative decision to the issues raised in the Statement of Errors.

Ninth grade was the highest grade of school that Plaintiff completed, but she did earn her General Education Degree ("GED"). (R. at 48.)

Plaintiff testified that her worker's compensation injury occurred on November 7, 2003. (R. at 64.) Following the injury, Plaintiff participated in rehabilitation and had unsuccessful attempts to return to work because of her knee. (R. at 64–65.) In 2011, Plaintiff had, and still has, trouble with stairs. (*Id.*) Plaintiff's knee swells, sometimes to the point where she has difficulty removing the knee brace. (R. at 65–66.)

In May 2013, Plaintiff worked for Starlight Cleaners, performing spotting, cleaning, pressing, and "just a little bit of everything." (R. at 48–49.) She stood all day at her job and the heaviest thing she regularly lifted or carried was ten or fifteen pounds of clothing. (R. at 50.) She worked eight hours a day for twenty-nine days. (R. at 49.) According to Plaintiff, she cried every day when she got home. (*Id.*) She stopped working there because her knee was so swollen, she could not where her knee brace, and she was in pain. (R. at 49–50.)

Plaintiff also previously worked full-time for Dublin Cleaners as an inspector, inspecting clothing. (R. at 50.) She worked there between four and six months and quit because of knee pain. (R. at 50–51, 66, 68.) She stood the entire time she was there except during breaks. (R. at 51.) The heaviest thing she lifted and carried was ten or fifteen pounds of clothing. (*Id.*)

In 2007, Plaintiff worked part-time for Broadway Cleaners, spotting, cleaning, and pressing clothing. (R. at 51.) She stood on her feet the entire time she worked there. (R. at 51–52.)

Plaintiff previously worked full-time as a plant manager for J&J Classic Cleaners, Incorporation. (R. at 52, 67.) She stood for most of the day at this job, changing perks, pre-

3

maintenance on machines, pressing, cleaning, whatever was needed. (R. at 52.) She also worked as a presser somewhere in the last seventeen or eighteen years. (*Id*.)

Plaintiff confirmed that all of her jobs at the different dry cleaners required her to stand and walk around as well as frequently bend and pick up clothes out of bags. (R. at 61.) She testified that she cannot sit at work and her employers would not have let her work there if she had to sit. (R. at 66–67.)

In 2011, Plaintiff could walk two miles a day for several days of the week, but she is not able to do that kind of walking now because of her knee pain. (R. at 59.) She testified that the knee pain is much worse now than it was in 2011. (R. at 60.) Plaintiff had physical therapy in 2000 and 2012 and 2013, exercising to strengthen the muscles around her knee. (R. at 63.)

**B. Vocational Expert Testimony**

Dr. Jerry A. Olsheski testified as a vocational expert ("VE") at the administrative hearing on October 5, 2015. (R. at 15, 71–77.) The VE testified that Plaintiff's past jobs include spotter at a dry cleaning business, a light exertion, semi-skilled job; presser at a dry cleaning business, a light exertion, unskilled job; a dry cleaning manager, a medium exertion, skilled job; inspector/quality control person at a dry cleaning business, a light exertion, semi-skilled job; and dry cleaner, a medium exertion, skilled position. (R. at 71.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE. (R. at 72–75.) The ALJ proposed a hypothetical to the VE that presumed Plaintiff's age, education, work experience, and limited to light work with the following limitations: frequent stooping, extreme temperatures, humidity, atmospheric conditions and pulmonary irritants; frequent reaching with the right upper extremity; frequent pushing and pulling with the right upper extremity; occasional ramps and stairs, balancing,

4

kneeling, crouching and crawling; occasional foot controls and overhead reaching with the right upper extremity; and never to climb ladders, ropes, and scaffolds. (R. at 72.) The VE testified that the hypothetical individual could perform past light work as a spotter and inspector. (*Id.*) The ALJ then asked the VE to assume the same hypothetical individual except with limitations of standing and/or walking a total of four hours a day. (*Id.*) The VE testified that such limitations would eliminate those past jobs. (R. at 72–73.) The ALJ next asked the VE to assume the same limitations and to lower the hypothetical individual to sedentary exertion. (R. at 73.) The VE testified that these limitations would also eliminate past work. (*Id.*)

The ALJ then asked the VE to assume a hypothetical individual limited to light work with no standing limitation and the following limitations: frequent stooping, extreme temperatures, humidity, atmospheric conditions and pulmonary irritants, reaching with the right upper extremity, pushing and pulling with the right upper extremity, occasional ramps and stairs, balancing, kneeling, crouching, crawling, foot controls, overhead reaching with the right upper extremity; and never ladders, ropes and scaffolds. (*Id.*) The VE testified that there existed other light, unskilled work such as an unskilled light mail clerk, with 1,400 local jobs and 255,00 national jobs; light unskilled inspector, with 2,000 local jobs and 250,000 national jobs; and light unskilled packing and filling machine tender, with 1,000 local jobs and 150,000 national jobs. (*Id.*)

The ALJ next asked the ALJ to presume the same limitations but with a standing and/or walking limitation to four hours a day and whether the mail clerk inspector would still have jobs available. (R. at 74.) The VE testified that "[t]he mail clerk would be even though it's classified as light in the DOT and in my experience mail clerk stand about half the day and sit about half of the day." (*Id.*) The VE also testified that an officer helper is another example of a light,

5

unskilled job, with 500 local jobs and 166,000 national jobs. (*Id.*)  The VE further testified that "in my experience . . . [office workers] usually stand about half the day and sit about half the day." (*Id.*)  According to the VE, lowering the exposure to extreme temperatures, humidity, atmospheric conditions and pulmonary irritants to occasional from frequent in the prior hypothetical does not affect the jobs of mail clerk, office helper, or inspector.  (R. at 74–75.)

The VE denied that there were any transferable skills to sedentary jobs.  (R. at 75.)  The VE testified that being off task for more than ten percent of a work day or being absent more than one day per month would be a problem and could lead to termination.  (*Id.*)  The VE testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO") except where noted as to mail clerk and office helper.  (*Id.*)

>Upon examination by Plaintiff's counsel, the VE testified as follows:
>
>Q   Now, I believe you stated -- hold on. I believe you stated if someone had a limitation of standing and walking four hours, that precluded her past work?
>
>A   That's right.
>
>Q   Okay and if that limitation -- I think you stated -- now, correct me if I'm wrong.  I think you stated that there are some light jobs but is that more of a sedentary profile?
>
>A   Yeah, I would view it more as sedentary.  I mean there are some light jobs as I've identified but usually anything understanding under six hours could be in the sedentary range especially in unskilled work.
>
>Q   Especially in unskilled work? Okay.  You did -- like I said you -- I almost called you Your Honor. You did say did say there were some light jobs for that what -- what you say what percentage that is? Is it - -
>
>A   It's -- it's hard to say.  I identified two occupations.  I mean -- I think it substantially reduces the light work.
>
>Q   And as -- as stated - -

6

A   You know but it would be hard to give a percentage/ [sic]

Q   Okay and as stated you said when you're dealing with unskilled too that limitation puts it more into the sedentary?

A   Probably.

(R. at 76–77.)

## III.  MEDICAL RECORDS

### A.  Radiology Reports

An MRI of Plaintiff's right knee taken on October 21, 2004, revealed grade I – II chonodromalacia of the medial facet of the patella; mild patellofemoral disease; and a small Baker cyst.  (R. at 351.)

An MRI of her right knee taken on August 18, 2006, revealed that the ACL and PCL were intact; the medial and lateral collateral ligaments were unremarkable; and the menisci were normal.  (R. at 19.)  Plaintiff was diagnosed with locking intramedullary rod in the proximal tibia with no internal derangement.  (*Id*.)

### B.  Gerald M. Rosenberg, M.D.

On May 11, 2006, Plaintiff presented for examination to Gerald M. Rosenberg, M.D. complaining of pain in her right knee.  (R. at 367.)  Dr. Rosenberg noted that she had a relatively locked knee with less than full range of motion and walked with a limp.  (*Id*.)  An x-ray of Plaintiff's right knee taken the same day revealed a medial meniscus tear.  (*Id*.)

Plaintiff presented to Dr. Rosenberg on May 24, 2007, for the purpose of scheduling arthroscopic surgery for her knee, which was approved by the Bureau of Workers' Compensation.  (R. at 365.)  Dr. Rosenberg performed the surgery in July 2007.  (R. at 386.)

### C. H. Tom Reynolds, M.D.

On March 25, 2008, H. Tom Reynolds, M.D., conducted an independent medical examination of Plaintiff. (R. at 385–88.) Upon examination, Dr. Reynolds noted a slight right antalgic gait component without the use of any ambulatory aids. (R. at 386–87.) Plaintiff's right knee fully extended symmetrically with the left, with the left knee bending normally actively and the right knee flexed actively to about 110 degrees, at which point Plaintiff described tightness. (R. at 387.) Dr. Reynolds noted no ligamentous laxity in either knee and noted that the right knee did not appear swollen, boggy or edematous. (*Id.*) Dr. Reynolds noted no palpable tenderness. (*Id.*) Dr. Reynolds opined that Plaintiff could not return to work at that time, but the restriction remained temporary. (R. at 387–88.)

### D. Emergency Department Records

On February 2, 2009, Plaintiff underwent right knee surgery. (R. at 555.)

On May 30, 2011, Plaintiff presented to the emergency room after she was hit from behind while riding on her motorcycle, causing the bike to fall on her leg. (R. at 777.) An examination revealed that flexion and extension was intact in her right knee. (*Id.*) An x-ray of the Plaintiff's right tibia demonstrated a right tibial IM rod, no acute fracture, and no evidence of hardware loosening. (R. at 778, 783.)

### E. James Power, M.D.

James Power, M.D., performed an independent examination of Plaintiff on April 14, 2009. (R. 565–66.) Upon examination, he noted that Plaintiff walked with a limp and favored her right leg. (R. at 566.) Dr. Powers noted that Plaintiff had pain on attempting to stand on a bent knee on the right, pain attempting to walk on her heel, and she was unable to walk on her toes because of the pain. (*Id.*) Her right knee was noted to be two degrees centigrade warmer

than the left with effusion in the joint. (*Id*.) Her right knee was two centimeters larger in circumference than the left; however, her ligament stability was good. (*Id*.) Plaintiff had full extension of both knees, flexion of the right of 125 degrees, and Patrick maneuver was negative on both sides. (*Id*.) Dr. Powers opined that he did not believe she could return to her prior employment and after completing treatment would be able to return to a job that did not require her being on her feet all day or using the right foot for operating foot controls. (*Id*.) Dr. Powers completed a functional capacity form that limited the claimant to lifting up to twenty pounds occasionally and ten pounds frequently; occasionally bend, twist/turn, stand/walk, and lift above her shoulders; never reach below her knee, push/pull, or squat/kneel; and that she was not able to return to work until her therapy was complete. (R. at 567.)

**F. Kelly Hickey, P.T.**

Kelly Hickey, P.T., completed a Functional Capacity Evaluation on June 24, 2009. (R. at 585–90.) Ms. Hickey reported that Plaintiff could lift 21–50 pounds occasionally, 11–25 pounds frequently, and 1–10 pounds constantly. (R. at 589.) Ms. Hickey indicated Plaintiff was able to complete twenty minutes of work circuit with minimal right knee discomfort. (R. at 590.) Plaintiff had full upper extremity and trunk range of motion. (*Id*.) She was mildly limited in her right knee and ankle range of motion. (*Id*.)

On August 27, 2009, Ms. Hickey completed another Functional Capacity Evaluation. (R. at 579–84.) Ms. Hickey reported that Plaintiff demonstrated excellent tolerance for the 1.5 hours of testing and that she could lift 21–50 pounds occasionally, 11–25 pounds frequently, and 1–10 pounds constantly. (R. at 583.) Ms. Hickey also noted that Plaintiff was able to complete twenty minutes work circuit with minimal right medial knee discomfort, had full range of motion in her upper and lower extremities, and had difficulty completing steps. (*Id*).

**G. James J. Sardo, M.D.**

James J. Sardo, M.D., performed an independent medical examination on August 28, 2009. (R. at 538–40.) Upon examination, Dr. Sardo noted that Plaintiff's gait was mildly antalgic, the range of motion of her right knee was lacking five degrees of extension, and there was 100 degrees flexion. (R. at 539.) Plaintiff was tender over the medial and lateral joint lines of the knee with no evidence of an effusion. (*Id.*) Dr. Sardo reported that Plaintiff had minimal crepitus with range of motion. (*Id.*) Her ligamentous stability was intact, motor strength was 5/5 in both lower limbs, sensation was intact, no swelling, and she had full range of motion at the right shoulder level with negative impingement testing. (*Id.*) Dr. Sardo opined that Plaintiff had not yet reached maximal medical improvement in her knee conditions, but had reached maximal medical improvement as to her right shoulder. (*Id.*) Dr. Sardo further opined that Plaintiff was unable to return to her past work. (*Id.*)

**H. Mark E. Pettay, D.C.**

On September 13, 2011, Plaintiff presented to Mark E. Pettay, D.C., for ongoing right knee pain. (R. at 790–91.) Plaintiff reported that she was walking two to two and a half miles a day. (R. at 790.)

**I. Ronald E. Kendrick, M.D.**

On August 14, 2015, Ronald E. Kendrick, M.D., completed medical interrogatories and a medical source statement. (R. at 1033–42.) Dr. Kendrick opined that Plaintiff did not meet Listing 1.02 because there was no evidence of ineffective ambulation. (R. at 1034.). Dr. Kendrick also opined that due to her severe impairments, Plaintiff was limited to lifting and carrying twenty pounds occasionally and ten pounds frequently; sitting six hours in an eight-hour workday; standing and walking four hours in and eight-hour workday; is limited to occasional

overhead reaching with the right upper extremity; frequent bilateral foot controls; she should never climb ladders, ropes, or scaffolds; occasionally climb stairs and ramps, balance, kneel, crouch, and crawl, and frequently stoop; never be exposed to unprotected heights or moving mechanical parts; occasional exposure to dust, odors, fumes, and pulmonary irritants and vibrations; and frequent exposure to extreme cold and heat, humidity and wetness, and operating a motor vehicle. (R. at 1036–40.).

**J. State-agency evaluation**

On August 16, 2013, Diane Manos, M.D., a state agency medical physician, reviewed the record and opined that Plaintiff was not disabled because there was insufficient evidence to evaluate the claim. (R. at 101–08.)

On November 27, 2013, James Cacchillo, D.O., a state agency doctor of osteopathic medicine, reviewed the record upon reconsideration and affirmed Dr. Manos' opinion. (R. at 110–17.)

## IV. THE ADMINISTRATIVE DECISION

On November 27, 2015, the ALJ issued his decision. (R. at 15–29.) Plaintiff meets the insured status requirements through September 30, 2011. (R. at 18.) At step one of the sequential evaluation process,[3] the ALJ found that through September 30, 2011, Plaintiff

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant

11

engaged in substantially gainful activity during the following periods: approximately October 2009 through the end of February 2010. (R. at 18.) However, the ALJ also found there were two continuous 12-month period(s) during which Plaintiff did not engage in substantial activity and that the remaining findings address those periods she did not engage in substantial gainful activity. (*Id.*) The ALJ found that Plaintiff had the severe impairments of status post right tibia and fibula fracture; coronary artery disease; status post myocardial infarction with angioplasty and stent placement times two; right knee chondromalacia of the patella; right knee osteoarthritis; status post right knee arthroscopy with chondroplasty; status post right knee arthroscopy with partial meniscectomy; right shoulder tendonitis; and asthma. (R. at 19–22.) He further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can: stand and/or walk for a total of four hours in an eight-hour workday. Additionally, she can frequently stoop, reach with the light upper extremity, and push/pull with the light upper extremity. She can have occasional exposure to extreme temperatures, humidity, atmosphelic conditions and pulmonary irritants. She can occasionally climb ramps and stairs. She can occasionally balance, kneel, crouch, crawl, use foot controls, and reach overhead with the right upper extremity. She can never climb ladders, ropes and scaffolds.

(*Id.*)

---

          perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

The ALJ noted that Plaintiff was born on February 16, 1957, and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured. (R. at 27.) The ALJ found that transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferrable job skills. (*Id.*) Relying on the VE's testimony, the ALJ concluded that even though Plaintiff cannot perform her past relevant work as a spotter, presser, manager, inspector-quality control, and dry cleaner, she could perform jobs that exist in significant numbers in the national economy. (R. at 26–28.) He therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. at 28.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

13

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff advances one contention of error. Plaintiff contends that the ALJ should have found her to be disabled because the RFC was inconsistent with light work and really limited her to sedentary work. (ECF No. 13 at 4–7.) Plaintiff, however, does not contend that the medical evidence justifies greater or different limitations contained in the present RFC, which provides, *inter alia*, that Plaintiff can stand and/or walk for a total of only four hours in an eight-hour workday. (*Id.*) Plaintiff instead argues that the ALJ should have assessed a sedentary RFC because the only jobs identified by the VE, mail clerk and office helper, were sedentary. (*Id.*) Plaintiff specifically argues that the ALJ must find her disabled pursuant to the Medical-Vocation Guidelines, 20 C.F.R. Pt. 404, Subpart P, App'x 2 (the "Grid") if she was limited to a sedentary RFC. (*Id.*)

Plaintiff's argument is not well taken because the United States Court of Appeals for the Sixth Circuit specifically rejected such an argument in *Anderson v. Comm'r of Soc. Sec.*, 406 F.

14

App'x 32 (6th Cir. 2010). As way of background, in determining whether a claimant is disabled, ALJs are required to perform a five-step analysis:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found disabled.

3. If the claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.) he is not disabled.

*Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)).

At the fifth step, "[a]n ALJ is to employ the grids, found at 20 C.F.R. Part 404, Subpart P, Appendix 2." *Id*. at 423. The Grid provides a series of vocational patterns and direct conclusions of either "disabled" or "not disabled" when the facts match the pattern. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00. "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." *Id*. at § 200.00(a). For instance, in Plaintiff in this case could perform a full range of light work, then accounting for her age (closely approaching advanced age at the time of her date last insured), high school education, and lack of transferrable skills, the Grid would dictate a

finding of "not disabled." *Id*. at § 202.13. If, however, Plaintiff could perform only sedentary jobs, the Grid would dictate a finding of disabled. *Id*. at § 201.12; *Anderson*, 406 F. App'x at 35.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). In performing sedentary work, "[a]lthough sitting is involved, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." S.S.R. 83-10. "[T]he primary difference between sedentary and most light jobs" is that light jobs "require[] a good deal of walking or standing[.]" *Id*.

Where a claimant's RFC is in between two exertional levels, the Grid is "not binding and [is] instead used only as an analytical framework." *Anderson*, 406 F. App'x at 35 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d)); *see also Salas v. Comm'r of Soc. Sec.*, No. 1:11 CV 1511, 2012 WL 3283415, at *7 (N.D. Ohio July 26, 2012) ("The grid itself explains its results are based on 'analysis of the various vocational factors (i.e., age, education, and work experience) in combination with the individual's *residual functional capacity* (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work)[.]'" (quoting 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00) (emphasis added by *Salas*), *adopted by* 2012 WL 3278913 (N.D. Ohio Aug. 10, 2012). When the Grid is not binding, "a VE is brought in to testify as to whether a significant number of jobs exist in the national economy that a hypothetical individual with the claimant's limitations can perform." *Anderson*, 406 F. App'x at 35 (citing SSR 83-12). "As long as the VE's testimony is in response to an accurate hypothetical, the ALJ may rely on the VE's testimony to find that the claimant is able to

16

perform a significant number of jobs." *Id.* (noting further that "fewer than 1000 regional jobs can be a significant number for purposes of determining whether a claimant is disabled").

Here, Plaintiff's RFC is in between two exertional levels: The ALJ found that Plaintiff could only stand or walk for four hours, but she could perform the other requirements for light work. Under these circumstances, the Grid is not binding on the ALJ and a VE was brought in to testify. *Id.* As set forth above, the VE in this case identified two jobs classified as light in the DOT, mail clerk and officer helper, which someone with Plaintiff's standing/walking limitation could perform. (R. at 73–74.) Based on the VE's testimony, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (R. at 27–28, 73–74.)

Plaintiff, however, points to VE testimony that she believes supports her argument that these positions as performed with the standing/walking limitation are sedentary and therefore required the ALJ to assess a sedentary RFC. (ECF No. 13 at 4–7.) The Court disagrees. "The VE does not testify as to what the claimant is physically capable of doing, but rather as to what jobs are available, given the claimant's physical capabilities. Thus, in a step-five analysis, the VE's testimony depends upon the RFC and not the other way around." *Anderson*, 406 F. App'x at 36; *see also Walters v. Comm'r*, 127 F.3d 525, 529 (6th Cir. 1997) ("Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled."); *Jones v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 608, 619 (S.D. Ohio 2015) ("The VE's testimony does not change this fact [the ALJ's RFC limiting the claimant to a reduced range of medium work]."). "Even if the only jobs actually available in the economy for [Plaintiff] with a light RFC happen to be sedentary, it does not

17

change the fact the [Plaintiff] is still capable of performing light work—and the exertional level of work a claimant can still perform at most is what application of the grid depends on, not on whether there are actually jobs available at that exertional level." *Salas*, 2012 WL 3283415, at *7; *see also Anderson*, 406 F. App'x at 36–37 ("'It is a non sequitur to argue that because plaintiff suffered conditions that limited her job base essentially to sedentary jobs, the ALJ erred in concluding that plaintiff was able to perform a limited range of light work.'") (quoting *Johnson v. Barnhart*, No. 05-C-129-C, 2005 WL 3271953, at *14 (W.D. Wisc. Nov. 29, 2005)).

Plaintiff next goes on to challenge the ALJ's reliance on the VE's testimony, complaining that the testimony was unclear and that the ALJ failed to ask the VE appropriate follow-up questions and that the VE testimony conflicted with the DOT. (ECF No. 13 at 5–7.) The Court again disagrees. As previously detailed, the VE never testified that Plaintiff's RFC limited her to sedentary work. (R. at 77.) The VE also unequivocally testified that someone with Plaintiff's RFC, which included a standing/walking restriction of four hours, could perform the light, unskilled jobs upon which the ALJ relied at step five. (R. at 73–74.)

Plaintiff also takes issue with the ALJ's reliance on the VE testimony where the VE testified that, in his experience, mail clerks and office helpers sit about half of the day. (R. at 74–75.) "However, a vocational expert may rely on sources other than the DOT, including her own past experience, in evaluating a hypothetical claimant's vocational potential." *Ellison v. Comm'r of Soc. Sec.*, 101 F. App'x 994, 996 (6th Cir. 2004).

Plaintiff's complaint that the ALJ erred in relying on the VE testimony where the VE admitted that his testimony was not consistent with the DOT is equally unavailing. A VE's testimony "generally should be consistent" with the DOT. S.S.R. 00-4p. If there is a conflict, the ALJ "must resolve the conflict by determining if the explanation given by the VE . . . is

18

reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." *Id*. The ALJ must "explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified." *Id*.

Here, the ALJ specifically asked the VE on the record whether there was a conflict with the DOT (R. at 75) and then the ALJ resolved that conflict, explaining as follows:

> The vocational expert testified that and individual with the above set-forth residual functional capacity could perform the above-discussed jobs. While the testimony is an accurate depiction of the exertional and environmental limitations outlined, the limitation on the ability to stand and walk for four hours in an eight-hour day is inconsistent with the Dictionary of Occupational Titles. The vocational expert based that part of his testimony on an examination of the information contained in the Dictionary of Occupational Titles, paired with his nearly 40 years of experience in the field of job placement, and his specific knowledge that these two occupations allow the worker to sit for half of an eight-hour work day. (Ex. B17E). The claimant did not dispute the qualifications of the vocational expert at hearing. Pursuant to SSR 00-4p the undersigned finds this a reasonable basis for the inconsistency between the DOT and the vocational expert's testimony.

(R. at 28.) Plaintiff has not challenged the VE's credentials or the ALJ's assessment of the VE's credibility. (ECF No. 13.) Notably, the ALJ "may rely on vocational expert testimony notwithstanding contrary conclusions in the DOT if the expert is found to be credible[.]" *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 847 (6th Cir. 2004). Accordingly, the Court finds that the ALJ adequately explained his reliance on the VE's testimony that conflicted with the DOT. *See* S.S.R. 00-4p.

For these reasons, the Court concludes that the ALJ's determination at step five is supported by substantial evidence. *Anderson*, 406 F. App'x at 35. Plaintiff's contention of error, therefore, is without merit.

## VII. CONCLUSION

In conclusion, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision. The Clerk is **DIRECTED** to enter final judgment.

**IT IS SO ORDERED.**


Date: March 19, 2018               /s/ *Elizabeth A. Preston Deavers*
                                   ELIZABETH A. PRESTON DEAVERS
                                   UNITED STATES MAGISTRATE JUDGE